IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Charlotte Thomas,            Case No. 3:23-cv-01935-JGC

       Plaintiff,

   v.                                 **ORDER**

Findlay Recovery Center, LLC, et al.,

       Defendants.

This case regards claims of employment discrimination, unlawful retaliation, and wrongful discharge.

Plaintiff Charlotte Thomas is a former employee of Defendant Findlay Recovery Center (the "Center"), an inpatient facility for substance use recovery in Findlay, Ohio. (Doc. 13-3, PgID. 149–50). Defendants Leandra Farthing and Tearany Tucker are also former employees of the Center who held supervisory roles while working there. (Doc. 13-3, PgID. 159; Doc. 13-6, PgID. 259–61; Doc. 13-17, PgID. 422).

In her complaint, Thomas alleged that the Center's termination of her employment constituted gender discrimination and unlawful retaliation under both federal and Ohio law. (Doc. 1, PgID. 11–13). Thomas further alleged that her termination constituted a wrongful discharge in violation of public policy under Ohio law. (*Id.* at PgID. 13–14). And Thomas claimed that Farthing and Tucker aided and abetted the Center's unlawful discrimination. (*Id.* at PgID. 14–15).

1

Pending is Defendants' motion for summary judgment as to all claims. (Doc. 13). Thomas filed her opposition, (Doc. 16), and Defendants replied, (Doc. 19).

For the reasons that follow, I grant Defendants' motion for summary judgment.

**Background**

On May 3, 2022, Thomas, who is female, began working as a therapist at the Center. (Doc. 13-3, PgID. 155). Thomas had primary responsibility for eight clients, all of whom were recovering from substance abuse issues. (*Id.* at PgID. 149–50). Thomas was to provide regular diagnostic assessments of and psychotherapy sessions for these clients. (*Id.* at PgID. 149–50, 154–55). Thomas also had at least some responsibility for addressing and de-escalating client health crises. (*Id.* at PgID. 150; Doc. 13-5, PgID. 252). Thomas's position with the Center was her first professional experience as a therapist. (Doc. 13-3, PgID. 179).

On her first day of work, Thomas complained to Tucker, the Center's human resources director, about the fact that Thomas's assigned office was next to that of Ben Downard, another Center therapist. (*Id.* at PgID. 176–77). Thomas and Downard, who is male, attended the University of Findlay's social work program together. (*Id.* at PgID. 185–86). While at school, Thomas filed a sexual-harassment complaint against Downard under Title IX based on Downard's conduct toward Thomas while working with her on a group project. (*Id.* at PgID. 186). After an investigation, the university required that Downard have no further contact with Thomas for the remainder of their time at school. (*Id.*).

Thomas explained to Tucker the nature of her concern regarding her office's location. (*Id.* at PgID. 177). She then asked to move offices. (*Id.*). Thomas claims that, although Tucker agreed to look into moving Thomas's office, Tucker also responded by telling Thomas to "stop acting like the victim" and "suck it up." (*Id.*). Thomas also claims that Farthing, the Center's

clinical director, became aware of Thomas's concerns about Downard. (*Id.*). Farthing told Thomas to stop telling others about her Title IX complaint against Downard because Thomas was "making Ben sound like a predator" and the Center struggled to hire male therapists. (*Id.*). According to Thomas, the Center ultimately did not allow her to switch offices. (*Id.*). Nevertheless, Thomas's concerns about potential harassment from Downard did not materialize. During her deposition, Thomas characterized both Downard and her working relationship with him as "respectful." (*Id.*).

As Thomas's employment continued, new issues arose. First, Thomas claims that Farthing failed to provide Thomas with the same training opportunities as Farthing gave other therapists, including Downard. (*Id.* at PgID. 178–79).

Second, Thomas raised concerns with both Farthing and others about some of the Center's business practices. (*Id.* at PgID. 179–81). According to Thomas, these practices included: copying and pasting information across documentation for separate client encounters; always rating client cravings high enough to avoid health insurance company questions regarding the necessity of treatment; improperly conducting diagnostic assessments when a client was incoherent or incompetent; recommending that clients pursue unnecessary further treatment; and misrepresenting the severity of a client's condition when speaking with the client's family after the client's early departure. (*Id.* at PgID. 179). Thomas complained to Farthing and other colleagues that these practices were unethical. (*Id.* at PgID. 180–81). But Thomas only suggested these practices might be fraudulent to professional mentors who had no affiliation with the Center. (*Id.* at PgID. 183).

Then, on May 16, Farthing disciplined Thomas for excessive absenteeism. (*Id.* at PgID. 165–66; Doc. 13-13, PgID. 402–03). According to the disciplinary action form, Farthing gave

Thomas her first disciplinary warning for failing to work her entire eight-hour shift on two preceding Fridays. (Doc. 13-13, PgID. 402). Farthing placed Thomas on a performance improvement plan that required a "perfect attendance record for 30 days" and "working 8 scheduled hours on all assigned days." (*Id.* at PgID. 403). Thomas claims that the Center did not similarly discipline a male colleague who also twice left early. (Doc. 13-14, PgID. 408).

That same day, one of Thomas's clients sought to leave the Center before the end of her course of treatment. (*Id.* at PgID. 406). In situations involving such "against medical advice" ("AMA") departures, the Center's staff engaged in a process termed "AMA blocking." (Doc. 13-7, PgID. 317). That process entailed a focused conversation between the client and a trusted Center staff member about the importance of continuing treatment and the risks associated with leaving early. (*Id.* at PgID. 317–18). Usually, that trusted Center staff member was the client's therapist. (*Id.* at PgID. 318). But any staff member with whom the client had a close relationship, including the Center's maintenance staff, could AMA block. (*Id.*).

According to Thomas, she was able to calm her client down on May 16 by assuring the client that she and Thomas would call the client's husband the next day. (Doc. 13-14, PgID. 406). A Center case manager agreed to meet with the client one-on-one the next day, as well. (*Id.*). Based on these assurances, Thomas's client agreed to remain in the Center's care. (*Id.*).

The following day, May 17, Thomas and the client called the client's husband as planned. (*Id.*). According to Thomas, the client confirmed with her husband during that conversation that she would remain at the Center. (*Id.*). Three hours after that call, however, the client returned to Thomas's office in anger and threatened to leave the Center unless the client received her departure date. (*Id.*).

4

Accounts of what happened next diverge. According to Thomas, she and her client attempted to meet with a case manager and then Farthing to resolve the issue, but both were busy. (*Id.*). Thomas and her client were then able to meet with Sarah Shaferly, the Center's executive director. (*Id.*). Shaferly agreed to ask Farthing for the client's discharge date. (*Id.*). Thomas then took her client back to her office, where they together again called the client's husband. (*Id.*). During that call, the client asked for someone to pick her up from the Center. (*Id.*). After finishing the call, Thomas received a text from Farthing telling Thomas to send the client to Shaferly's office. (*Id.*). Thomas walked with her client to Shaferly's office, where Farthing then told Thomas that they did not need Thomas in the room. (*Id.*). Thomas then went outside to smoke. (*Id.*). At a staff meeting about twenty minutes later, Thomas further discussed her client's ongoing AMA crisis with Shaferly, Farthing, and other staff. (*Id.* at PgID. 406–07). Thomas detailed the client's conversations with her husband, including that the client had requested from her husband that someone pick her up from the Center. (*Id.* at PgID. 407). Shaferly then asked that another staff member help Shaferly AMA block Thomas's client. (*Id.*). Thomas claims Shaferly did not ask Thomas for her help. (*Id.*). Twenty minutes later, Thomas ended her shift around 4 PM and left the facility. (*Id.*; Doc. 13-3, PgID. 170).

In her account, Thomas claimed that no other staff member attempted in any way to contact her for help addressing her client's AMA crisis. (Doc. 13-14, PgID. 407). The only related communication Thomas described was a text from Farthing after the end of Thomas's shift that day asking whether the client had made specific plans to leave. (*Id.*). Farthing apparently wanted to include this information in the required documentation regarding the incident. (*Id.*). Thomas did not respond to this text because her shift had ended and because she had earlier explained that the client requested someone pick her up from the Center during the

5

client's conversation with her husband. (*Id.*). Thomas received no further updates regarding her client. (*Id.*).

In Farthing's account of that day, however, Farthing first became aware that Thomas's client sought to leave the Center after a tech doing rounds, who came across the client packing in her room, sent out a staff-wide notification regarding the AMA crisis. (Doc. 13-6, PgID. 287). After receiving that notification, Farthing went to the client's room to AMA block. (*Id.*). Shaferly and the alerting tech were also present, but not Thomas. (*Id.*). Farthing claimed that she and Shaferly remained in the client's room for an hour and a half to two hours trying to convince the client to remain at the Center. (*Id.* at PgID. 287–88). Farthing then left the room to contact someone whom Farthing identified as the client's boyfriend and explain the risks of the client's early departure. (*Id.* at PgID. 288). Farthing and Shaferly's efforts were unsuccessful, however, and the client left the facility. (*Id.* at PgID. 287). Farthing claimed that her only attempt to contact Thomas regarding the incident was the text she sent asking for information from Thomas to include in the incident documentation. (*Id.* at PgID. 287–88).

Shaferly provided yet another, differing account of what happened that day. According to Shaferly, when she received word that the client planned to leave, she first sought out Thomas in her office and then the common area but could not find her. (Doc. 13-7, PgID. 319). Shaferly then sent a tech to continue looking for Thomas while Shaferly went with Farthing to the client to AMA block. (*Id.*). Shaferly also attempted to contact Thomas on her handheld radio but could not reach her. (*Id.* at PgID. 326). Shaferly stated that she and Farthing were with the client in her room for about an hour. (*Id.* at PgID. 321). According to Shaferly, Farthing left the room for a time to join the search for Thomas but returned after being unable to find her. (*Id.* at PgID. 320).

Shaferly could not recall whether she asked a third staff member to assist in the AMA block. (*Id.* at PgID. 321).

After the AMA block failed and the client left the Center, Shaferly reviewed the facility's camera footage to identify Thomas's whereabouts during the AMA crisis. (*Id.* at PgID. 320–21). According to Shaferly, that review revealed that Thomas had been outside the facility smoking before Thomas then departed for the day. (*Id.* at PgID. 321). Shaferly did not recall a staff meeting that day at which Thomas discussed her client's ongoing AMA crisis. (*Id.* at PgID. 322). Shaferly also did not recall meeting with the client that day prior to the AMA block attempt. (*Id.*).

This incident ultimately led to Thomas's termination. According to Brian Thornsberry, the Center's chief operations officer, Farthing called him at some point during the AMA crisis on May 17 for advice on handling the situation. (Doc. 13-4, PgID. 237). Farthing also spoke with Dr. Carson Economy McCall, the Center's chief clinical officer, about the incident. (Doc. 13-6, PgID. 293). That same day, Thornsberry reviewed the relevant camera footage and discussed with Dr. McCall how best to handle what happened. (Doc. 13-4, PgID. 238, 240).

Thornsberry claimed that his review of the camera footage showed Thomas taking the client into the Center and then returning outside to smoke a cigarette for about ten minutes. (*Id.* at PgID. 239). Cross-referencing this footage with documentation of the incident, Thornsberry concluded that Thomas's smoke break occurred during the client's AMA crisis. (*Id.*). Thornsberry then observed Thomas re-enter the facility and engage with Farthing. (*Id.*). Thornsberry also observed Thomas's client return to her room, where other staff members engaged with her. (*Id.*). Thornsberry could not further identify these staff members. (*Id.*). Based on his review of the camera footage surrounding the incident and with input from Dr. McCall,

7

Thornsberry decided to terminate Thomas's employment with the Center. (*Id.* at PgID. 240). Thornsberry communicated that decision through Dr. McCall and Tucker to the relevant Center staff. (*Id.*; Doc. 13-6, PgID. 294; Doc. 13-17, PgID. 423).

The next day, Farthing, Shaferly, and Tucker conducted Thomas's termination meeting. (Doc. 13-3, PgID. 173). At that meeting, they presented Thomas with a document for her signature providing the reasons for her termination. (*Id.* at PgID. 174–75). Those reasons included: failing to disclose the client's call for a ride home to other staff; taking a smoke break while the client was in crisis "instead of trying to deescalate the situation"; being "[r]epetitively late or absent from the duties of work"; and "[m]isuse of time management." (Doc. 13-19, PgID. 439). Thomas refused to sign the document. (Doc. 13-3, PgID. 174).

Thomas claims that her termination constituted unlawful gender discrimination and retaliation under Title VII and related state law. (Doc. 1, PgID. 11–13; Doc. 16, PgID. 488–500, 504–07). Thomas also claims that her termination was a wrongful termination in violation of public policy under state law. (Doc. 1, PgID. 13–14; Doc. 16, PgID. 500–04). Defendants now seek summary judgment regarding Thomas's claims. (Doc. 13).[1]

## Legal Standard

Federal Rule of Civil Procedure 56 requires that I grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*,

---

[1] In her complaint, Thomas also brought a claim against Farthing and Tucker of aiding and abetting discrimination in violation of state law. (Doc. 1, PgID. 14–15). In her opposition to Defendants' motion for summary judgment, however, Thomas did not present any arguments regarding this claim. (Doc. 16). I therefore conclude that Thomas abandoned this claim. *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited.").

477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings." *Celotex*, 477 U.S. at 324. But the non-moving party "need only present evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257.

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001). I must "view the record and any inferences to be drawn from the underlying facts in the light most favorable to the party opposing summary judgment." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986)). My task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### Discussion

1. <u>Thomas's Retaliation Claims</u>

Title VII prohibits an employer from retaliating against an employee who "has opposed any practice made an unlawful employment practice by [that] subchapter." 42 U.S.C. § 2000e-3(a). "A plaintiff who alleges retaliation in violation of Title VII may establish the claim through direct or circumstantial evidence." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644 (6th Cir. 2015). Here, Thomas argues that circumstantial evidence supports her retaliation claims. (*See* Doc. 16, PgID. 488).

The legal framework for analyzing Title VII retaliation claims relying on circumstantial evidence is well-established:

9

> To establish a prima facie case of retaliation, [an employee] must show: (1) she engaged in protected activity (i.e., communicated opposition to discriminatory employment practices); (2) [the employer] was aware of the protected activity; (3) after [the employee] engaged in protected activity, [the employer] took an adverse employment action against her; and (4) the protected activity caused the adverse action. The burden of establishing a prima facie case in a retaliation action is not onerous and is easily met.
>
> If [the employee] establishes her prima facie case, the burden shifts to [the employer] to provide evidence of a legitimate, nondiscriminatory reason for terminating [the employee]. Then [the employee] must show that [the employer]'s proffered reason is mere pretext for unlawful retaliation. She can do so with evidence that [the employer]'s reason had no basis in fact, did not actually motivate the decision, or was insufficient to warrant the adverse action.

*Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 827 (6th Cir. 2019) (internal citations and quotation marks omitted).[2]

Thomas argues that the discomfort she expressed regarding the proximity of her office to that of Downard, against whom she had previously filed a sexual harassment complaint under Title IX, constitutes "protected activity" under Title VII. I disagree.

"To come within the protection of Title VII, [an employee] must establish that [s]he challenged an employment practice that [s]he reasonably believed was unlawful." *Yazdian*, 793 F.3d at 645. "Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice." *Id.* But Title VII also does not protect a "vague charge of discrimination." *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

---

[2] Because "[t]he same analysis applies to retaliation claims under both federal and Ohio state law," my reasoning and conclusions in this section also pertain to Thomas's state-law retaliation claim. *Crawford*, 773 F. App'x at 827 n.2.

10

Here, the record is clear that Downard did not harass Thomas during the period of their employment together at the Center. Indeed, as I noted above, Thomas characterized both Downard and her working relationship with Downard as "respectful." (Doc. 13-3, PgID. 177). Instead, Thomas seems to argue that the Center's decision to place her office next to Downard's was an unlawful employment practice, or at least a practice that Thomas reasonably believed was unlawful, because of the potential for future harassment that the Center's decision created. Title VII, however, "has never protected employees in connection with their complaints about *potential* or *future* violations that they feared might occur." *Jordan v. Alt. Res. Corp.*, 467 F.3d 378, 379 (4th Cir. 2006). Thomas's initial trepidation at working alongside Downard and her decision to report her trepidation to her managers is understandable. And at least by Thomas's account, the reaction of Thomas's managers to her report appears callous. But there is simply no evidence in the record that Thomas experienced any sexual harassment while working at the Center, whether from Downard or anyone else.

Because Title VII does not protect employee complaints about possible but unrealized Title VII violations, Thomas failed to show she engaged in "protected activity" as that statute requires. I will therefore grant summary judgment in favor of Defendants regarding Thomas's retaliation claims under Title VII and related state law.³

2. Thomas's Claims of Gender Discrimination

Title VII prohibits "discharg[ing] any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff alleging that her employer violated this prohibition may prove her claim using either direct or circumstantial

---

³ In reaching this decision, I need not consider and therefore do not decide the alternative bases for summary judgment that Defendants proffer regarding Thomas's retaliation claims.

evidence." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016). Here, Thomas relies on circumstantial evidence to assert her claims of gender discrimination. (Doc. 16, PgID. 504).

To prevail on summary judgment, a plaintiff relying on circumstantial evidence to support her discrimination claim must "make a prima facie showing that she (1) was a member of a protected class, (2) was subjected to an adverse employment action, (3) was qualified for her position, and (4) was replaced by a person outside the protected class or was treated less favorably than a similarly situated person who was not a member of the protected class." *Crawford*, 773 F. App'x at 831. If the plaintiff can establish those elements, then the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016). And if the defendant provides such a reason, a plaintiff's claim may still survive summary judgment if the plaintiff identifies evidence from which a reasonable jury could conclude that the defendant's reason is a pretext for unlawful discrimination. *Id.*[4]

Here, the parties dispute whether Thomas was qualified for her position and whether the Center treated Thomas less favorably than a similarly situated male employee. (Doc. 13-2, PgID. 119–21; Doc. 16, PgID. 505–07). Because I conclude that Thomas failed to present evidence showing that the Center treated her less favorably than a similarly situated male employee, I do not reach the question of whether Thomas was qualified for her position.

"Where employees 'engaged in different conduct, and the differences in their conduct are relevant,' they are not similarly situated for employment discrimination purposes." *Crawford*,

---

[4] "As with the retaliation claims, Ohio discrimination law follows federal law, and so the federal discrimination analysis applies equally to [Thomas]'s state claims." *Crawford*, 773 F. App'x at 831 n.5.

773 F. App'x at 831 (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)). "[T]he plaintiff's and comparator's actions need not be identical, but the 'conduct must be similar in kind and severity.'" *Id.* at 832 (internal citations omitted) (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012)).

On this issue, Thomas relies on her testimony that the Center provided more training to Downard than to Thomas. (Doc. 13-3, PgID. 178–79; Doc. 16, PgID. 506). Thomas also points to evidence that Downard, like Thomas, twice left work early, but the Center did not discipline Downard as it did Thomas. (Doc. 13-14, PgID. 408; Doc. 16, PgID. 506). Thomas's reliance on this evidence, however, misapprehends the nature of the inquiry here. The adverse employment action that Thomas challenges is her termination, not a lack of training or unfair attendance discipline. And there is no dispute that the Center's stated reasons for terminating Thomas's employment included not just Thomas's attendance issues, but also how Thomas handled her client's AMA crisis. (*See* Doc. 13-19, PgID. 439). The caselaw requires that Thomas present a comparator who engaged in like conduct of similar severity, but she failed to do so.

Instead, Thomas argues that, because she disputes the factual narrative surrounding how she handled her client's AMA crisis, I may not consider that event in my analysis here. (*See* Doc. 16, PgID. 506–07). In Thomas's view, Downard is thus an appropriate comparator. (*Id.*). But there is nothing contradictory about accepting Thomas's account of what happened, as I must at this stage, and still requiring Thomas to point to a comparator who engaged in similar conduct. But Thomas presents no evidence, for example, of a male therapist who acted as she claims to have acted in response to a client's AMA crisis but whom the Center did not terminate. Thomas also does not attempt to show that her actions in response to her client's AMA crisis were relevantly similar to those of a male therapist in some similar type of client crisis.

13

In the absence of such evidence, I conclude that Thomas has failed to show that the Center treated her less favorably than a similarly situated male employee. I will therefore grant summary judgment in favor of Defendants regarding Thomas's gender discrimination claims under Title VII and related state law.

3. <u>Thomas's Claim of Wrongful Termination in Violation of Public Policy</u>

As the Sixth Circuit explained in *Bender v. Champlain Enterprises, LLC*:

> Ohio law provides that an at-will employee . . . generally has no guarantee of continued employment. There is, however, a "public policy" exception to the employment-at-will doctrine. To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must show: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissal under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) lack of an overriding legitimate business justification for the dismissal (the overriding justification element). The clarity and jeopardy elements present questions of law, while the causation and overriding justification elements present questions of fact.

797 F. App'x 1008, 1013 (6th Cir. 2020) (internal citations and quotation marks omitted). The parties dispute all four elements of Thomas's claim here. (Doc. 13-2, PgID. 124–27; Doc. 16, PgID. 500–04).

Although she identified a variety of Ohio statutes allegedly relevant to her claim in her complaint, (Doc. 1, PgID. 14), Thomas focused her opposition briefing on only one: Ohio Rev. Code § 2913.47, which describes the crime of insurance fraud. Because I conclude that Thomas failed to proffer evidence supporting the jeopardy element of her wrongful-discharge claim, I do not decide any other elements of that claim.

The Sixth Circuit analyzes the jeopardy element using three factors:

14

> (1) [D]etermine "what kind of conduct is necessary to further the public policy" at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Bender*, 797 F. App'x at 1014 (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)). "[A]n employee simply must have had a good faith belief that [his] complaint was valid at the time of his complaint." *Id.* (quoting *Himmel*, 342 F.3d at 600). But an employee must also "give the employer clear notice that the employee's complaint is connected to a governmental policy." *Id.* (quoting *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005)); *accord Beckloff v. Amcor Rigid Plastics USA, LLC*, 93 N.E.3d 329, 340–41 (Ohio Ct. App. 2017).

In *Bender*, the plaintiff employee claimed that the defendant airline's termination of her employment was retaliation for her complaints about printing errors resulting from the defendant's flight manual printing processes. *Bender*, 797 F. App'x at 1014–15. Pointing to federal regulations governing flight manual contents and presentation, the plaintiff argued that her termination jeopardized public policies supporting pilot safety. *Id.* The Sixth Circuit, however, concluded that the plaintiff had failed to provide the defendant with sufficient notice that her complaints connected to a governmental policy. *Id.* The Sixth Circuit found that the plaintiff "did not initially raise [her complaints] as safety concerns specifically." *Id.* at 1015. Because she instead "reported them in the course of a larger series of complaints about [her supervisor]'s competence," the Sixth Circuit concluded that the defendant "could have reasonably interpreted [the plaintiff]'s complaints as stating her individual grievances." *Id.*

Like the plaintiff in *Bender*, Thomas here never specifically raised with her managers the issue of insurance fraud as the foundation of her concerns about the Center's business practices.

15

Indeed, as I previously noted, Thomas admitted during her deposition that she only expressed a concern about fraud to professional mentors who had no affiliation with the Center. (Doc. 13-3, PgID. 183). To her supervisors and colleagues at the Center, however, Thomas repeatedly explained her concerns as revolving only around whether the Center's practices were ethical. (*Id.* at PgID. 179–81). Of course, it is entirely appropriate for an employee to raise ethical concerns about the business practices of her employer. And many unethical business practices are also illegal. But I am unwilling to hold that, for purposes of a wrongful-termination-in-violation-of-public-policy claim under Ohio law, an employee who tells her employer that her complaints sound only in ethics puts her employer on sufficient notice of the connection between her complaints and the specific governmental policy reflected in the fraud statute that Thomas identifies here.

Because I conclude that Thomas failed to establish the jeopardy element of her claim of wrongful termination in violation of Ohio's public policy, I will grant summary judgment in favor of Defendants regarding that claim.

## Conclusion

For the foregoing reasons, it is hereby ORDERED THAT:

Defendants' motion for summary judgment, (Doc. 13), be, and the same hereby is, granted.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge